Andrew G. Watters
555 Twin Dolphin Dr., Ste. 135
Redwood City, CA 94065
andrew@andrewwatters.com
+1 (415) 261-8527

Plaintiff, pro se

# UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF WASHINGTON

|  |  |
|---|---|
| Andrew G. Watters, | Case no. 2:23-cv-00755-RSL |
|     Plaintiff, | **VERIFIED FIRST AMENDED COMPLAINT** |
| v. | 1.   EXTORTION |
| Mahsa Parviz, | 2.   FRAUD |
|     Defendant, | 3.   FALSE PERSONATION |
|  | 4.   UNFAIR COMPETITION |
|  | 5.   DECLARATORY RELIEF |
|  | 6.   VEXATIOUS LITIGANT DETERMINATION |
|  | 7.   COMPUTER FRAUD<br>18 U.S.C. sec. 1030(a)(7)<br>18 U.S.C. sec. 1030(a)(4) |

**INTRODUCTION**

1.    The purpose of this action is to rectify the bilking and harassment of a hard-working professional by a serial felon and impostor who suffers from mental health issues and will not stop contacting him from prison.  At present, it is now two years after the parties' brief relationship in April/May 2021, and a year and a half after her latest felony convictions following a Federal jury trial in December 2021 (she is currently imprisoned in SeaTac Federal Detention Center).

2.    The latest development in this now two year-long saga is that Defendant is threatening to file a frivolous Domestic Violence action in Plaintiff's local court system, specifically to trash his reputation among the judges by airing the parties' "dirty laundry," unless Plaintiff takes down his personal web page about Defendant.[1]  The web page is *100% true* and *100% fair* to Defendant, who really said and did all of the things stated, such as claiming to be an accomplished medical researcher who held dual M.D. and Ph.D. degrees from Harvard when that is not the case.[2]  The web page is to protect the public from Defendant's diabolical, illegal schemes.  In any event, Defendant is a vexatious litigant under State and Federal law, and Plaintiff seeks that determination in addition to the other requested relief.

---

[1]    https://www.andrewwatters.com/hall-of-shame/mahsa-parviz/

[2]    Defendant never attended Harvard Medical School, nor did she earn any degrees from Harvard, nor did she ever obtain a medical license.  Despite this, she still signs her letters from prison as "Dr. Parviz."  Plaintiff discovered this aspect of the fraud in February 2022.

**PARTIES**

2      3.    Plaintiff Andrew G. Watters is a resident of California

3  and a licensed attorney, with 17 years in practice and 29 trials

4  (license number #237990 in California and the U.S. District Court

5  for the Northern District of California, admitted November 2005).

6  He graduated from the University of California College of Law San

7  Francisco (formerly U.C. Hastings College of the law) in 2005,

8  and UCLA in 2002.

9      4.    Defendant Mahsa Parviz is a prisoner currently located

10  in Washington.  She graduated high school and attended a junior

11  college in Texas, purportedly followed by the University of

12  Texas, followed by Harvard Extension.  It is unclear whether she

13  ever graduated from the University of Texas.  In any case, she

14  did not graduate from Harvard, Harvard Medical School, or any

15  other prestigious institutions.  She falsely claims that she

16  has a M.D. and Ph.D. from Harvard and holds herself out as "Dr.

17  Parviz" in substantially all written correspondence.  According

18  to her own attorney's psychiatric evaluation, she suffers from

19  Borderline Personality Disorder and Bipolar Disorder.  She is

20  currently serving a sentence of 61 months under convictions for

21  Passport Fraud and Aggravated Identity Theft in the Central

22  District of California with a release date in early 2026.

**JURISDICTION AND VENUE**

24      5.    This Court has subject matter jurisdiction based on

25  a Federal Question pursuant to 18 U.S.C. sec. 1030(g), which

26  permits civil actions for damages and injunctive relief against

27  persons committing fraud with computers, as discussed in the new

28  seventh cause of action.  Secondarily, the Court has jurisdiction

predicated on Diversity of Citizenship, in that there are various state law claims asserted under California law, and the amount in controversy exceeds $75,000 after accounting for (1) special damages, (2) general damages, and (4) punitive damages.

6.    Venue is proper in this District because Defendant resides here.

**GENERAL ALLEGATIONS[3]**

7.    Let's start at the beginning, which was April 2021. I had posted a profile on a major online dating website.  I found Mahsa in a search for tall, attractive, athletic women under 35 with graduate degrees (lol).  Yeah, she was seriously attractive-- a 5'9 dark-haired Persian statue, basically. Unfortunately I deleted all those photos when it became clear that she was a beautiful psycho.  Anyway, we met in April 2021 (she was 45 minutes late for our first date, and I nearly left). We hit it off great and were talking about how great we were for each other.  Everything seemed great for 24 hours, but then I Googled her.  In addition to her Harvard persona, a mug shot apparently from one of her cases came up, and I was confused. Wait a second...did I just...you know...with a multiple felon who was pretending to be someone else?  Oh my freaking god.

> "Every nerve ending, all of my senses, the blood in my veins, everything I had was screaming, 'Take off, man, just bam, get the fuck outta there!'  Panic hit me like a bucket of water. First there was the shock of it--BAM, right in the face!  Then I'm just standing there drenched in panic."
> --Mr. Orange, Reservoir Dogs (1992)

8.    But wait...was this really the same person?  That's

---

3    Written in the first person for full effect.

where it got confusing. She had talked about wanting to complete the Law Office Study Program offered by the State Bar of California in order to...become a lawyer. A lawyer who pled guilty to attempted kidnapping, evading the police, apparently forging a judge's signature, and other felonies? Impossible that this was the same person.

9. It turned out to be the same person. Mahsa Parviz, at that point a seven-time convicted felon, actually asked me to study law in my office so she could become a lawyer. I told her that if those things were true, then she had zero chance of ever becoming a lawyer with that record, and it was a complete waste of effort that I was not willing to undertake. I asked her to explain her possible multiple felonies, and she initially said those had all been dismissed. But that's not what the dockets showed-- the dockets showed that her appeals had been dismissed as part of her guilty pleas. What the hell was going on? I explained this to her and she steadfastly denied ever being convicted of these seven felonies. Was I supposed to believe or not believe her without independent proof? I have no idea. Obviously, now I know the truth, but at the time it wasn't clear. By the way, she said she was not married (also a lie-- she was briefly married to the father of her child and apparently still is because her nullity petition in L.A. County was dismissed for lack of prosecution).

10. Let me be clear on another thing: I never was hired as Mahsa's attorney, nor did I ever appear for her in any case or file papers for her. I did help out with a couple legal issues as best I could while dating her, which is perfectly legal. At no

point in this account do I reveal anything confidential, which in any case would be covered by the crime/fraud exception, in that Mahsa was committing crimes, was a fugitive from justice on a Texas warrant, and was otherwise scamming me into helping her get her daughter back (her parental rights had been terminated in Texas). She was obsessed with this crusade to the point of extorting me into providing legal help by threatening to end the relationship if I didn't comply. Of course it seemed less sick at the time when I was blinded by the possibility of having finally met someone great for me after a long drought.

11. This email that I sent to the Harvard IT department in February 2022 sums it up well:

Dear Mr. Dash,

You're listed as the Administrative Contact in the harvard. edu domain name record, and you seem to be the appropriate recipient for this inquiry.

I am a lawyer in California. I have been following the case of USA v. Parviz, which is a Federal criminal case in Los Angeles, CA against Mahsa Parviz. Ms. Parviz was recently convicted of filing a false passport application and aggravated identity theft in connection with an attempt to abduct her estranged biological daughter from foster care.

Ms. Parviz and I were in a personal romantic relationship in Spring 2021. When I learned that she was (at that time) a seven-time felon, was suffering from poorly treated or untreated mental illness, and was a compulsive liar, I ended the relationship. What I didn't know until yesterday 2/2/2022 was that she never attended Harvard Medical School and never earned a M.D. or Ph.D. there, contrary to her continuous representations-- at least as of October 2021, she continued to sign her emails with both of her non-existent degrees.

At the beginning of the relationship, I tried to do my due diligence by Googling her, and my search produced the following legitimate-looking Harvard web pages:

https://scholar.harvard.edu/mparviz

https://collaborate.med.harvard.edu/display/~MP284/

Parviz%2C+Mahsa
She also had a valid Harvard email address that she used to accept email-- which is still valid as of today, as verified by connecting to the Harvard email server via Telnet: mparviz@fas.harvard.edu

Finally, Ms. Parviz has several purported publications, and even courses she supposedly taught, listed on her Harvard web pages. The collection of Harvard web pages and related materials made me believe that she had the degrees she represented, and I didn't feel the need to look further. The fake Harvard persona tipped the balance between dating her and not dating her, as well as believing her or not believing her, as I'm sure it has for other guys as well.

It turns out that Ms. Parviz was enrolled in Harvard Extension School for a time, according to records filed in a lawsuit in 2017 when Ms. Parviz sued Harvard to release her non-existent Harvard Medical School transcripts. Please see attachment, which is the declaration of the H.E.S. Dean explaining the circumstances, and attaching Ms. Parviz's application for Harvard Extension School that clearly shows Ms. Parviz's situation. I have no idea why Ms. Parviz would sue Harvard knowing that she never attended Harvard Medical School and could not possibly have any transcripts there, but perhaps that is due to some type of mental condition.

Anyway, Ms. Parviz appears to have hacked or at least misused her Harvard Extension credentials to create a fake identity on the Harvard website and make people think that she was an accomplished medical researcher and graduate of Harvard. Her Harvard web pages readily appear on Google when people search for her name, although her criminal cases have taken precedence at this point.

I am counting myself lucky to have not (so far) had permanent fallout from this toxic relationship, other than a continuous stream of harassing and inappropriate emails, letters, and texts. But I would like to ask Harvard to at least consider deleting Ms. Parviz's web pages and disabling her email address for violations of the Harvard acceptable use policy so that her substantial fraud does not continue. The imprimatur of Harvard is a big deal and is worth protecting from frauds and cheats.

I'm cc'ing the prosecutors in Ms. Parviz's case because I think Ms. Parviz's fraudulent Harvard persona is relevant to her sentencing, which is coming up in March 2022. She's at least rational enough to know that impersonating a Harvard M.D./Ph.D. is wrong, and I hope that this awareness and her bad behavior factor into her sentencing in some fashion.

Best,

Andrew Watters

12.  So...you be the judge. Was I reasonable in believing her when she steadfastly, repeatedly, and consistently claimed to have Harvard degrees that appeared confirmed by her official-looking Harvard web pages? I don't know. She had photos and other evidence showing that she worked at the hospital at Harvard in some capacity, and lots of credible-sounding stories. But let's continue with the story.

13.  Colorful highlights of this awful experience include, but are not limited to:

14.  She once asked me to reload a prepaid American Express card for her while she waited in the car, and it's still unclear to me whether the hundred dollar bills she handed me were authentic or counterfeit. I had this thought and realized the risk while the 7-11 clerk was counting out the bills and then hesitated (while looking at me a little funny) before handing them back to me when Mahsa's AMEX prepaid card was declined to be reloaded. I shrugged, then I bought a few small items in the store and acted as normal as I could while the clerk was staring at me. I was absolutely sweating bullets as I walked out of that store because I knew that I would be the one to get in trouble for handing the clerk an envelope of possibly fake bills without actually looking at the bills first...yeah, what a dummy for trusting her. Thank god the card was declined, which on a reload could only mean one thing...Mahsa was on the run (turns out she had an active warrant in Texas). In all fairness, I did glance at the bills after the reload failed, and I didn't see anything suspicious, which is why the relationship continued. But my point is that this is how easily I could have been arrested and

possibly lose my law license because of Mahsa manipulating me. Wow, she is truly diabolical and has absolutely no regard for other people.

15.     She was legally homeless (she claimed to be searching for a place after recently moving back to the area from Texas) and bounced around from hotel to hotel depending on whichever hotel would let her stay there with a prepaid card. Her parents gave her a lot of money, which is how she supported herself while being unable to work a normal job.

16.     She was charged with grand theft in state court for allegedly stealing a guy's jewelry and Adderall. The case has languished in Santa Clara County, presumably due to her Federal charges and conviction.

17.     I witnessed her commit at least one petty theft when she deliberately entered a gym without paying after she told me her membership had expired, and then abused their generosity by using the entire facility for hours, even after they closed and I was waiting for her in the parking lot for about 45 minutes.

18.   Don't get me wrong-- there were some positive things in the relationship after she assured me she was not a seven-time felon and also swore that to the extent she had legal problems, it's because she was framed by her former brother-in-law, a lawyer in Texas. I thought that maybe this was my destiny: a beautiful, superintelligent young woman who was a possibly reformed criminal but who adored me, and that this was my chance to finally have someone in my life. What could I do?

19.   Okay, so fast forward to early June 2021. After yet

another argument where she threatened to dump me if I didn't help get her daughter back, and another series of erratic, bizarre SnapChat audio messages at 3 a.m., I decided that I had had enough. I dumped her and sent her a Dear Jane email. I blocked her on SnapChat, phone, and email, and promised myself that I would never make the same mistakes again.

20.   After about five weeks of not hearing from her, I felt a sense of relief, but also a sense of curiosity. Why hadn't I heard from her when she had been so vocal in her desire to rekindle the relationship? I googled her again and was shocked to see USA v. Parviz, the Federal criminal case regarding the false passport application. I confirmed that she was in custody using the Federal inmate locator, and that answered my question. Part of me felt bad for her and the other part of me felt glad that she was behind bars. So I felt conflicted...and keep in mind, at this point I still thought she was an accomplished medical researcher with M.D. and Ph.D. degrees from Harvard. So what did I do? I wrote her a letter stating how I felt, as well as my concerns about her competency to stand trial in a Federal criminal case. Whoops...this appears to have prompted the ongoing campaign of harassment I have experienced.

21.   First, she started writing me letters-- about twenty pages of letters, many of which talked about the future in an endearing fashion. Then she starting calling, texting, and emailing. I was still developing the situation, so I didn't know what to do. I didn't want to talk to her on jail calls, and I didn't want to get texts from her. So I let her send emails. Honestly it was an engaging correspondence for about a

month and a half until I finally blocked her after yet another
inappropriate series of messages. I can't recall exactly what she
said, but it was something about being taken care of financially
by someone else who she was talking to. I thought, wait a
second-- you send me letters talking about a future with me and
then you threaten to pick someone from a purportedly deep pool of
suitors? Sick, which is how she thinks.

22. So yeah, by then I had met my now-wife and the rest
is history. But I still keep getting calls, texts, and emails
from Mahsa and/or her mom. The last straw was yet another time-
wasting request where Mahsa asked me to send her "file" to her
attorney, who her mom confirmed was the longtime family attorney.
The problem is, when I reached out to confirm the request with
the attorney, he said he didn't represent Mahsa-- and he didn't
respond to my subsequent email asking if he still wanted anything
I had gathered while helping out Mahsa with her legal problems.
I then blocked Mahsa's latest phone number (somehow she keeps
sending texts from jail), complained to the Bureau of Prisons,
and made it clear that if I get a single additional communication
from Mahsa, I will finally get that restraining order I talked
about previously. I am not sure what that would accomplish
considering that Mahsa is already in jail, but it would be a
symbolic gesture at least. I am finally taking this complaint
online because I have nothing else I can do at this point to stop
her harassing communications for good.

23. What did I learn from all this? Well, some people are
just so screwed up that they can't help but commit felonies.
Mahsa appears to be one of those people. In retrospect, I just

have to recognize that I am the victim of a scam and go from there. At least I don't appear to have any lasting effects from this toxic relationship, other than emotional trauma from the roller coaster I experienced. I am eternally thankful that I was able to resist the temptation of someone so wrong but so attractive, in order to meet someone so right (and just as attractive), who I am with now.

24. If further proof is needed, just check out the summary of the trial evidence from the government that's in their opposition to Mahsa's motion for acquittal. Sad. The motion for acquittal was obviously denied. And she hasn't even tried to appeal her conviction!

25. I have way more things to share, but I will start by adding more supporting documents as I find the time so that this is finished once and for all and is unassailable proof that this walking disaster of a person needs to disappear for the length of her sentence, which I estimate at five years given her lengthy and serious criminal history.

26. Update March 14, 2022 - the Harvard information security department is looking at the web pages and they sent a polite email back.

27. Update March 19, 2022 - Harvard deleted her fake web page.

28. Update March 21, 2022 - I've heard from a couple other victims, as well as one person who wants to post counterpoint-type mitigating factors on here. After much consideration, I've decided that I'm going to host a counterpoint/mitigation section below with comments and supporting documents from persons who

1  want to defend Mahsa in some fashion-- as long as they take
2  responsibility for whatever they post on here with their names
3  and contact information. It's only fair to permit that since I
4  have a megaphone here while Mahsa is in prison and can't respond.

5     29.  Update April 4, 2022 - I had a very interesting
6  conversation with another victim who says Mahsa tried to take him
7  for a million dollars. Wow.

8     30.  Update June 19, 2022 - Mahsa's sentencing will be in
9  July 2022. Meanwhile, she followed through on her extortionate
10 threat to report me to the State Bar if I didn't remove my web
11 page. I received a letter of inquiry, to which I responded within
12 20 minutes. I have nothing to hide and I categorically deny
13 doing anything improper. As a thank-you for her extorting me, I
14 am going to post an email I received from one of her Boston-area
15 friends, who says he sent the following email to Mahsa's family
16 in an effort to conduct an intervention. Here it is, verbatim:

17     Dear Mr. Parviz,

18     My name is Andrew Taylor; I have been a friend of your
       daughter Mahsa for a few months now.  Mahsa is an
19     intelligent, hard-working, lovely young woman in whom I see
       tremendous potential.  However, as I'm sure you're aware,
20     she has led a lifestyle here in Boston that is causing me
       and the rest of her friends great concern.  We wish to
21     intervene and help her make better decisions but we don't
       quite know where to start; I am writing today to solicit
22     your input.  Among her concerning behaviors:

23     -Compulsive drinking.  Mahsa, despite being legally
       underage, consumes significant amounts of alcohol on a daily
24     basis, despite having endured an alcohol-induced miscarriage
       during her relationship with Mark as well has having been
25     arrested for DUI.  Her alcohol consumption has reached the
       point that we cannot take her to a restaurant that serves
26     alcohol without her ordering several drinks, regardless of
       her ability to afford them or any events on her agenda that
27     would require her to present a polished image; there have
       been several instances where Mahsa's alcohol consumption
28     has resulted in her missing job interviews and classes at

Harvard.  I have personally witnessed her using her sister's
driver's license numerous times as a means to enter liquor
stores and drinking establishments.

-Compulsive shopping and financial irresponsibility.  Mahsa
owns numerous clothing articles from very reputable name
brands (Gucci, Prada, etc.) and continues to buy many more,
yet she has no clear means of affording them.  Visits to her
apartment have resulted in her friends, myself included,
finding notices from Neiman Marcus, Macy's and Walmart,
demanding immediate payment for significantly large credit
balances Mahsa owes them; Mahsa recently disclosed to her
boyfriend [redacted] that her credit score is only slightly
higher than 500, which doesn't qualify her for a loan of any
sort.  To illustrate her lack of financial responsibility,
this semester, she complained to her boyfriend, [redacted],
that she was unable to afford her tuition for the semester.
[redacted] immediately suggested that she return some of
her very expensive clothing items, in response to which she
threatened to divorce him if he ever suggested such an idea
if they were to get married.  Further, she has bragged to
several of her friends, myself included, that nothing gets
her parents to send money to fuel her shopping habits more
quickly than the phrase "Mommy, I'm hungry!".

-Poor language.  Mahsa doesn't hesitate to use obscenities
when addressing her friends, especially if she is upset.
I recently inquired with her about why her Facebook and
LinkedIn profiles suggest she is a PhD candidate at Harvard,
when I know first-hand that she is attempting to get into
the ALM (Master of Liberal Arts) program in finance at
Harvard. Her response was the following:

"Hey fat fuck! Yeah I'm getting my masters and my phd. Go
stick it up your butt buddy [redacted]'s ass and don't speak
to me again. I don't talk to your kind loser. :)...you have
no friends you depressed fucking loser"

I wish I could tell you that outbursts like these are rare
but unfortunately, they are quite common.  Mahsa routinely
talks like this to anyone here in Boston who has the nerve
to refuse her demands, most commonly for alcohol and money,
or when the truth in her statements comes under question.

-Sexual promiscuity.  Mahsa has disclosed to [redacted] that
she has had numerous sexual partners, many of whom with
which she has had unprotected sex.  She has had numerous
relationships, all of which have been terminated as a result
of her being sexually unfaithful to her partner; her most
recent relationship with [redacted] ended as when she came
to Dallas for a wedding, she had sex with a surgeon she met
at the wedding.  Mahsa received a birth control shot shortly
after she moved to Boston, presumably with money provided
by you, and has used this as an excuse to have unprotected
sex with men she typically has known for less than a couple

of weeks.  We are worried that when the shot's potency
inevitably wears off, her sexual habits will continue which,
combined with her egregious alcohol consumption, will result
in Mahsa enduring a second miscarriage.

Mr. Parviz, I'm not writing to you today with the intention
of ratting her out, I'm writing because I and all of
my mutual friends with her know that this pattern of
irresponsibility will result in imminent consequences for
her.  We wish to intervene before it is too late but she
has resisted our efforts and continues to habitually make
poor decisions.  Any sort of encouragement or advice you can
provide to me would be greatly appreciated.

With warmest regards,
Andrew Taylor

31.  Update July 2, 2022 - Mahsa's State Bar complaint was
dismissed, as expected. Meanwhile, the Government filed a pre-
sentencing report recommending a sentence of 81 months (6 years
9 months) in prison due to Mahsa's extensive criminal history
and flagrant disregard for the law. I was disappointed to see
the Harvard angle omitted from the report, but I guess they
had enough ammunition without it. According to Mahsa's defense
counsel's own psychiatric evaluation of her, she has Borderline
Personality Disorder and Bipolar Disorder. I am not surprised in
the least by that, nor am I surprised by her trying to get out
of a stiff sentence by claiming that her mental health problems
caused her to offend. Mahsa deserves to go to prison for a
long time, and her sentencing is on July 12, 2022. Will update
this with additional documents in the near future, including
my restraining order filing that I've finally gotten around to
completing.

32.  Update July 3, 2022 - I heard from [redacted], who
left me a voicemail stating that he cannot be associated with
Mahsa in any way. I debated for a while before redacting his name

from Mr. Taylor's email. On the one hand, redacting information is inconsistent with my policy of radical honesty. However, Mr. Taylor vouched for [redacted] and said he knew [redacted] is a good guy. That was enough for me, setting aside privacy concerns. So there you have it, I balanced privacy and radical honesty appropriately in a difficult case. Also, by request, here is the Government's pre-sentencing report, and Mahsa's response. I laughed out loud at her response, especially in the "acceptance of responsibility" section.

33. Update July 14, 2022 - Mahsa has been sentenced to 61 months in prison (five years, one month) followed by three years of supervised release during which she has to obtain mental health treatment. I am also ready to pull the trigger on the restraining order, I just need to sign the forms. I guess that's a wrap for now.

34. In May 2023, I received another letter from Defendant, which is attached as **Exhibit A,** following my express directive for no contact. In it, Defendant threatens to file what would be a frivolous Domestic Violence action against me in San Mateo County, where I practice, specifically to trash my reputation among the local judiciary-- unless I take down my web page about her. This was the last straw, and this action followed.

### FIRST CAUSE OF ACTION

### EXTORTION

35. Through the foregoing course of conduct, Defendant violated California state law prohibiting extortion, specifically Cal. Penal Code sec. 518(a) in threatening to defame, slander, and/or reveal private information about Plaintiff unless he gave

1 in to her demand to take down his web page about her.

2     36.  Wherefore, Plaintiff prays for special damages, general

3 damages, and punitive damages.

4 **SECOND CAUSE OF ACTION**

5 **FRAUD**

6     37.  Through the foregoing course of conduct, Defendant

7 obtained at least $10,000.00 from Plaintiff in addition to

8 substantial emotional distress suffered by Plaintiff.  This

9 included Plaintiff believing Defendant's false c.v., which is

10 attached as **Exhibit B,** until discovering the true facts in 2022.

11     38.  Wherefore, Plaintiff prays for special damages, general

12 damages, and punitive damages.

13 **THIRD CAUSE OF ACTION**

14 **FALSE PERSONATION**

15     39.  Through the foregoing course of conduct, Defendant

16 violated California state law prohibiting false personation,

17 specifically Cal. Penal Code sec. 529, through her impersonation

18 of an accomplished medical researcher claiming non-existent

19 degrees.  Plaintiff only discovered this aspect of the fraudulent

20 scheme in February 2022.

21     40.  Wherefore, Plaintiff prays for special damages, general

22 damages, and punitive damages.

23 **FOURTH CAUSE OF ACTION**

24 **UNFAIR COMPETITION**

25     41.  Through the foregoing course of conduct, Defendant

26 violated Federal law against wire fraud, in that she sent her

27 false c.v. from her Harvard email address, which was interstate.

28 In addition, Defendant violated various criminal statutes in

California.  California state law prohibits unfair competition, which is covered by Business and Professions Code sec. 17200 and is predicated on Defendant's violations of various criminal statutes.

42.  Wherefore, Plaintiff prays for restitution in an amount according to proof.

## FIFTH CAUSE OF ACTION

### DECLARATORY RELIEF

43.  Through the foregoing course of conduct, as well as Defendant's false claims made to the State Bar of California, there is a dispute between Plaintiff and Defendant concerning their rights and duties.

44.  Wherefore, Plaintiff seeks a decree that there was never any contract between Plaintiff and Defendant for the provision of legal services, and no attorney-client relationship.

## SIXTH CAUSE OF ACTION

### VEXATIOUS LITIGANT DETERMINATION

45.  Through the foregoing course of conduct, Defendant violated California state law prohibiting vexatious litigation under CCP sec. 391.

46.  This includes (1) Defendant's attempt to re-litigate the loss of her parental rights in Texas, after which she forged a judge's signature on a court order and then filed the forged order in a new, frivolous Domestic Violence case in Orange County, California-- all in an attempt to regain custody of her daughter using abusive and unauthorized legal process.  This was an attempt to re-litigate the parental rights termination in another state after a final determination against her by

the highest court of her own state, in violation of Cal. Code
of Civil Procedure sec. 391(b)(2); and other matters yet to be
discovered by Plaintiff.  A single violation of 391(b)(2) is
sufficient for a vexatious litigant determination.

47.  This Court is empowered to make a finding of vexatious
litigation pursuant to the All Writs Act, 28 U.S.C. sec. 1651,
and enter a pre-filing order.

48.  Wherefore, Plaintiff prays for a pre-filing order
enjoining Defendant from filing vexatious litigations in any
court, including this Court and California state courts.

**SEVENTH CAUSE OF ACTION**

**COMPUTER FRAUD**

**Count One**

**18 U.S.C. sec. 1030(a)(7)**

49.  Through the foregoing course of conduct, Defendant
violated 18 U.S.C. sec. 1030(a)(7) prohibiting extortion as a
means of interfering with the integrity of information available
on a protected computer.

50.  To wit, Defendant attempted to extort Plaintiff into
removing his web page about Defendant, which is served from a
computer used extensively in interstate commerce,[4] and which
would be a thing of value, in violation of 18 U.S.C. sec.

_____
4    Plaintiff's primary server containing the web page is
physically located in his office in California, and is located on
the Internet at IPv4 address 38.122.223.130.  Plaintiff's primary
server is used to serve multiple websites worldwide via the
Cogent fiber network that connects to the Internet, while also
running Plaintiff's email system.  Plaintiff's email system is
also used for worldwide email transmission and receipt.  Server
logs demonstrate substantial interstate use of Plaintiff's server
by visitors outside California, including Texas where Defendant
is originally from.

1030(a)(7)(A)-(C) prohibiting threatening damage to a protected computer; and additionally, Defendant sought restoration of her fake Harvard web pages by threatening Plaintiff via extortionate means. This occurred in May 2023, shortly before this action was filed, and the action is therefore timely.

51. Wherefore, Plaintiff prays for special damages and permanent injunctive relief prohibiting future violations of the computer fraud law, pursuant to 18 U.S.C. sec. 1030(g).

**Count Two**

**18 U.S.C. sec. 1030(a)(4)**

52. Through the foregoing course of conduct, Defendant violated 18 U.S.C. sec. 1030(a)(4) by hacking and/or exceeding the authorized use of Harvard web servers in order to create her fake Harvard web pages, and thereby defrauded Plaintiff out of at least $10,000.00. The loss occurred in May 2021, but the damage was only discovered in February 2022 when Plaintiff discovered that the Harvard web pages were fake and had been created through the indicated computer tampering. In addition, February 2022 is when Plaintiff discovered that Defendant's extensive c.v. sent to Plaintiff via interstate wire was a complete fabrication. As such, this action is timely under 18 U.S.C. sec. 1030(g)

53. Wherefore, Plaintiff prays for special damages and permanent injunctive relief prohibiting future violations of the computer fraud law, pursuant to 18 U.S.C. sec. 1030(g).

**PRAYER**

1. Special damages according to proof and not less than $75,001.00

2. General damages according to proof.

3.     Punitive damages according to proof.

4.     Attorney fees to the extent permitted by law.

5.     Pre-filing permanent injunction against Defendant.

6.     Computer fraud injunction prohibiting the threatened violations of the computer fraud law and enjoining Defendant from restoring her fake Harvard web pages, whether at Harvard or elsewhere on the Internet.

7.     Such other and further relief as is just and warranted.


Date: May 25, 2023          *Andrew G. Watters*
                            _____
                                Andrew G. Watters


## VERIFICATION

I have read the foregoing complaint and certify that the facts stated therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Date: May 25, 2023          *Andrew G. Watters*
                            _____
                                Andrew G. Watters

Exhibit A

May 7th, 2023

Hi Andrew,

I hope all is well w/ you. I'm writing regarding your lawfirm webpage. I was able to get all the content you posted about me last year removed on search engines but I was recently informed they're popping back up so I wanted to just reach out to you to have you remove all content about me & my family (the alternative is me filing a DVRO in Redwood City & even though you're done a lot of damage, I'd rather not let all the judges you practice in front of know our dirty laundry & that we met on SA... plus I have to go to Travis County, TX next month b/c Roger is testifying at the TDI trial & it would be better if they didn't decide to subpoena you, too, based on bad blood made public on your site.

My Harvard Scholar page isn't fraudulent... please get it back online! I have co-authors on all of my research & everything is available on hollis.harvard.edu, dash.harvard.edu, nih.pubmed.gov as well as the journal webpage or American Academy of Neurology (I'm an elected member since 2018) You said some disturbingly sexist things, Andrew. I'm not comfortable w/ anyone knowing about my intimate affairs (that should stay private between two people & we had a deal at the beginning of the arrangement.

Please write me back asap when the pages are deleted or if you prefer to contact my attorney, Tommy, you can email him at Thomas@bundy-law.com.

Sincerely,
Dr. David

Exhibit B



**Dr. Mahsa Parviz**
info@parvizmed.org | (657) 210-0021 | 107 Avenue Louis Pasteur Box 252, Boston, MA 02115
eRA COMMONS USER NAME: mparviz1 | Google Scholar Publications | Academic Profile

## EDUCATION

- **Post-Graduate Certificate, Applied Biostatistics**
  Harvard Medical School Clinical and Translational Science Center – Boston, MA (2015 – 2016)
  - Program director: Brian Healy, PhD
- **M.D./Ph.D., Neurobiology Candidate**
  Harvard Medical School/Graduate School of Arts and Sciences – Boston, MA (2008 – 2015)
  - Dissertation title: "Disorders of GABA metabolism: SSADH and GABA-transaminase deficiencies."
  - 2013 and 2014 Harvard Medical School Innovation Fellows Program Scholar (award accepted 2013-2014 and 2014-2015, declined 2015-2016).
  - Research Sub-Award Recipient for MD/PhD program, Harvard Clinical and Translational Science Center (NIH grant number 1 UL1 RR025758).
- **B.S., Global Business, minor in Neuroscience**
  University of Texas at Dallas – Richardson, TX (2011)
  - 2007 State of Texas Highest Ranking Graduate Scholarship, Texas Education Agency
- **Honors High School Diploma**
  Willow Bend Academy – Plano, TX (2007)
  - Class of 2007 Valedictorian

## RESEARCH & CLINICAL EXPERIENCE

- **Instructor – Department of Surgery**
  Harvard Medical School (2015 - 2017)
  - Seminars and lectures in General Surgery, Genetics, Neurology, Internal Medicine, and Pediatrics.
- **Research Director – Department of Surgery**
  Harvard Medical School/Brigham and Women's Hospital – Laboratory for Surgical and Metabolic Research (2015 - 2016)
  - Hospital and academic appointment by Chief Medical Officer Dr. Stanley G. Ashley.
  - Received a generous bequest of the Harvard-based laboratory which formerly belonged to a leading transplant surgery innovator, the late Dr. Francis D. Moore, and continued independent research towards fulfilling residency requirements, collaborated with industry and academic institutions, mentored 4 M.D. fellows in General Surgery and 4 undergraduate students and one medical student over the time span of one year.
- **Clinical Research Scientist**
  The Epilepsy and Clinical Neurophysiology Center at Boston Children's Hospital (2014 - 2016)
  - Received the merit-based William G. Lennox Scholars in Medicine Award at Harvard Medical School for research of pediatric neurotransmitter disorders under the mentorship of Dr. Phillip L. Pearl, M.D, HMS William G. Lennox Chair and Professor of Neurology and Boston Children's Hospital Director of The Epilepsy and Clinical Neurophysiology Center.
  - Brief overview of experience includes patient database oversight, manuscript preparation, textbook chapter editing, observing patients in the Epilepsy Center, identification of mutations in the *ALDH5A1* gene, construction of national posters and research involvement in the development of an NIH-funded phase II clinical trial of SGS-727 therapy in SSADH deficiency (NCT02019667).
- **Research Scientist**
  The Tannous Laboratory at Massachusetts General Hospital Department of Neurology (2014 - 2015)
  - In vivo and in vitro experimentation of two novel drug therapeutics for glioma stem cell therapy in the MGH Experimental Therapeutics and Molecular Imaging Laboratory under the guidance of Dr. Bakhos Tannous, Ph.D., and Dr. Christian Badr, Ph.D.
- **Visiting Research Scholar**
  The Saint-Geniez Laboratory at Schepens Eye Research Institute (2014 - 2015)
  - Conducted dry Age-related Macular Degeneration (AMD) research and investigated the phagocytotic pathway of photoreceptor outer segment (POS) and fetal human retinal pigment epithelium.
- **Research Committee Member**
  Crimson Care Collaborative – Massachusetts General Hospital Revere Pediatrics (2013)
  - Performed data analysis working as a member of the Harvard Medical School student-faculty free clinic.

## PROFESSIONAL & RELEVANT EXPERIENCE

- **Founder**
  Mahsa Parviz, LC. d/b/a/ Parviz Pharmaceuticals and Health Systems (2014 - Present)
  - Developed clinical research organization in 2014 through funding by Harvard Medical School's Center for Primary Care Innovation Fellows Program (merit-based selection criteria) in conjunction with Brigham and Women's Hospital under the mentorship of HMS professor Dr. Rose M. Kakoza, M.D., M.P.H.

- Incorporated Wyoming-based LLC in 2016 for which I oversee all SOPs, NDAs, compliance, regulatory affairs, legal affairs, outreach efforts and presentations to industry leaders with special emphasis on industry drug development and multidisciplinary health care redesign.
- Recruited and trained team of physicians, medical assistants, nurses, graduate and medical students for an initial pilot phase of the advanced, centralized, multidisciplinary high-risk care management program.
- U.S. NPI: 1679045401 registered for Mahsa Parviz provider specialty in Plastic and Reconstructive Surgery (physician/general surgery) and Research Study (organization); Durable Medical Equipment distribution license # 1001962 active in State of Texas.

- **Founder**
  STEPS to Health, Inc. (2013 - Present)
  - Developed academic research organization in 2013 through funding by Harvard Medical School's Center for Primary Care Innovation Fellows Program (merit-based selection criteria) in unison with Boston Children's Hospital under the mentorship of HMS professor Dr. Jennifer K. Cheng, M.D.
  - Incorporated in 2015 as a Massachusetts-based non-profit corporation for which I serve as PI/Study director of several parallel clinical trials with oversight of pre-clinical trials.
  - Developed validated clinical tools, health coach training curriculum, and co-authored guidebook on implementing our health coaching model for use at universities and hospitals across the nation and worldwide.
  - Recruited and trained team of 6 Harvard undergraduates and 3 graduate students for initial pilot phase of health coaching program where at-risk families of obese and over-weight pediatric patients were educated on how to adopt healthy behaviors and the physician health goals were monitored.

- **Co-Founder**
  Pharmaceutical Products of America, Corp. (2012 - 2014)
  - Incorporated compounding pharmacies and diagnostic facilities in Dallas/Ft. Worth metroplex.

- **Co-Founder**
  Zelletek, LLC (2008 - 2013)
  - Managed day-to-day operations of the nascent biotechnology company specializing in biosensor development and real-time cell culture assays for toxicity testing in drug development and personalized cancer treatment.
  - Established and maintained relations with academic institutions and research corporations such as George Mason University, Stanford University and Plexon Inc.

- **Senior Advisory Board Member & Private Consultant**
  UNT Center for Network Neuroscience (2007 - 2018)
  - Conducted audits, maintained primary responsibility of research facility for announced/unannounced FDA and USDA audits, and oversaw all matters pertaining to compliance, legal, and regulatory requirements for home laboratory, external clinical trials, and satellite facilities.
  - Private consultant for clinical trials and commercialization of drugs and biomedical devices to industry leaders, including Fortune 100 buyers.
  - Completed J-Term project from Dec. 2013 – Jan. 2014 conducting independent research and developing continuous glucose monitoring device for use in cell culture and delivered educational presentation on diabetes mellitus and synopsis of specific parameters which were to be improved upon integrating the new continuous glucose monitoring system to Department of Biological Science and research team.

---

## SELECTED PEER-REVIEWED PUBLICATIONS•, BOOK CHAPTERS AND PROFESSIONAL MEMBERSHIPS•

- **Parviz M**, Vogel K, Gibson KM, Pearl PL. Disorders of GABA metabolism: SSADH and GABA-transaminase deficiencies. J Pediatr Epilepsy. 2014;3(4):217-227. Publisher's Version
- **Parviz M**, Kaptain GJ, Vincent DA, Sheehan JP, Laws ER. Transsphenoidal Approaches for the Extracapsular Resection of Midline Suprasellar and Anterior Cranial Base Lesions: Revision. Neurosurgery. 2015;(49):94-101.
- Pearl PL, **Parviz M**, Vogel K, Schreiber J, Theodore WH, Gibson KM. Inherited disorders of gamma-aminobutyric acid metabolism and advances in *ALDH5A1* mutation identification . Dev Med Child Neurol. 2015;57(7):611-7.
- Yuskaitis CJ, **Parviz M**, Loui P, Wan CY, Pearl PL. Neural Mechanisms Underlying Musical Pitch Perception and Clinical Applications Including Developmental Dyslexia. Curr Neurol Neurosci Rep. 2015;15(8):574.
- Lapalme-Remis S, Lewis E, De Meulemeester C, Chakraborty P, Gibson KM, Torres CH, Guberman A, Salomons G, Jakobs C, Ali-Ridha A, **Parviz M**, Pearl PL. Natural history of succinic semialdehyde dehydrogenase deficiency through adulthood. Neurology. Aug 12 2015.
- Pearl PL, Koenig MK, Riviello J, Christie M. Bain J, Averill K, Chung WK, Chiriboga CA, Hodgeman R, **Parviz M**, Gibson KM. Novel Intervention in Gaba-transaminase Deficiency. Annals of Neurology. 78:S177-S178 Oct 1 2015.
- Pearl PL, **Parviz M**, Hodgeman R, Gibson KM. Succinic semialdehyde dehydrogenase deficiency. In: Reimschisel T (ed.) MedLink Neurology. San Diego, California: MedLink Corporation; Apr 16, 2016.
- Pearl PL, **Parviz M**, Hodgeman R, Gibson KM. GABA-transaminase deficiency. In: Reimschisel T (ed.) MedLink Neurology. San Diego, California: MedLink Corporation; May 3, 2015.
- Attri SV, Singhi P, Wiwattanadittakul N, Goswami JN, Sankhyan N, Salomons GS, Roullett J, Hodgeman R, **Parviz M**, Gibson KM, Pearl PL. Incidence and Geographic Distribution of Succinic Semialdehyde Dehydrogenase (SSADH) Deficiency. In: JIMD Reports, Volume 34. Berlin, Germany: Springer Nature; Nov 5 2016.
- Pearl PL, **Parviz M**. Chapter 61: Overview of Seizures and Epilepsy in Children. In: Swaiman's Pediatric Neurology: Principles and Practice, 6e. Elsevier Health Sciences. Mar 16 2017.

- Pearl PL, **Parviz M.** [Chapter 76: Inherited Metabolic Epilepsies.](#) In: Swaiman's Pediatric Neurology: Principles and Practice, 6e. Elsevier Health Sciences. Mar 16 2017.
- **Parviz M,** Parviz M. [From Bench to Bedside: Reducing Novel Therapeutic Platforms to Practice.](#) In: Bloom BH (ed.) Medicine and Materials Express. Vol. 1. 1st ed. Boston: Harvard Health Publications; 2011. pp. 735-751. [Publisher's Version](#)
- **Parviz M,** Parviz M. [From Bench to Bedside: Drug Development Methods in Personalized Medicine.](#) In: Bloom BH (ed.) Medicine and Materials Express. Vol. 1. 1st ed. Boston: Harvard Health Publications; 2011. pp. 752-763. [Publisher's Version](#)
- **Parviz M,** Parviz M. [From Bench to Bedside: Microelectrode Arrays in Personalized Medicine.](#) In: Bloom BH (ed.) Medicine and Materials Express. Vol. 1. 1st ed. Boston: Harvard Health Publications; 2011. pp. 764-779. [Publisher's Version](#)
- **Parviz M,** Parviz M. [From Bench to Bedside: CRISPR and Gene Editing in Personalized Medicine.](#) In: Bloom BH (ed.) Medicine and Materials Express. Vol. 1. 1st ed. Boston: Harvard Health Publications; 2011. pp. 780-787. [Publisher's Version](#)
- [Massachusetts Medical Society](#)
- [American Neurological Association](#)
- [American Academy of Neurology](#)
- [MedLink](#)
- [American Heart Association](#)
- [American Society of Cytopathology](#)
- [Harvard Federalist Society](#)

| HONORS | |
|---|---|
| 2005 | **Science & Technology Young Achiever, American Collegiate Accreditation Association** |
| 2007 | **State of Texas Highest Ranking Graduate Scholarship, Texas Education Agency** |
| 2007 | **The Gerald D. Cagle Prize for Research and Development, Alcon** |
| 2007 | **Southern Methodist University President's Scholarship (declined)** |
| 2007 | **U Michigan Medical Scholarship (declined)** |
| 2007 | **Baxter Foundation / Stanford Medical School Scholarship (declined)** |
| 2008-2012 | **Research Sub-Award Recipient, Harvard Clinical and Translational Science Center (NIH grant number 1 UL1 RR025758)** |
| 2010 | **Mannick Research Award** |
| 2010 | **Peter Bent Brigham Scholar** |
| 2012 | **Graduate Travel Scholarship for Academic Distinction and Service from FIRE (a non-profit organization of advocates in higher education), Harvard University** |
| 2012 | **Graduate Travel Scholarship for Healthcare Policy Reform from the Leadership Institute, Harvard University** |
| 2012-2013 | **Clare Booth Luce Ladies Scholarship for Leadership, Harvard University** |
| 2013 | **Robert Osteen Teaching Award, Harvard Medical School** |
| 2013-2015 | **Innovation Fellows Program Award, Harvard Medical School (accepted 2013-14 and 2014-15, declined 2015-16)** |
| 2013-2018 | **Research Sub-Award Recipient, Harvard Clinical and Translational Science Center (NIH grant number 1 UL1 TR001102)** |
| 2013-2018 | **Research Sub-Award Recipient, Harvard Medical School and Boston Children's Hospital (NIH/NINDS clinical trial identifier NCT02019667)** |
| 2014-2016 | **The William G. Lennox Scholars in Medicine Award, Harvard Medical School and Boston Children's Hospital** |
| 2014 | **Health Accelerator Challenge Top Ideator, Harvard Medical School and Harvard Business School** |
| 2015 | **Partners in Excellence Award, Brigham and Women's Hospital** |
| 2015 | **Kessler Young Faculty Award, Brigham and Women's Hospital** |
| 2015 | **Simonian-Murray Prize for Research Excellence in Surgery, Brigham and Women's Hospital** |
| 2015 | **Excellence in Teaching Award, Harvard Medical School** |
| 2016-2017 | **Editorial Board Award for Medical Advancement, MedLink Neurology** |
| 2016-2018 | **Expert Reviewer Award for Rare Disease Research, Orphanet** |

| RESEARCH SUPPORT | | |
|---|---|---|

**Ongoing Research Support**

| | | |
|---|---|---|
| Departmental Grant (Restricted); Neurology | Pearl, Phillip L. (PI) | 07/01/14 – 07/01/19 |
| Boston Children's Hospital | | |
| Evaluation of Pediatric Neurotransmitter Disorders | | |
| Role: Co-Investigator | | |

**Completed Research Support**

| | | |
|---|---|---|
| NCT02019667 | Theodore, William H. (PI) | 12/10/13 – 11/30/18 |
| NIH/NINDS | | |
| Phase 2 Clinical Trial of SGS-742 Therapy in Succinic Semialdehyde Dehydrogenase Deficiency | | |
| Role: Co-Investigator and Trial Coordinator | | |
| | | |
| Departmental Grant (Restricted); Biological Sciences | Gross, Guenter W. (PI) | 04/01/17 – 05/31/18 |
| University of North Texas | | |
| Center for Network Neuroscience | | |
| Role: Co-Investigator | | |

1UL1TR001102; 1TL1TR001101; 1KL2TR001100　　　　　　　　Nadler, Lee M. (PI)　　　　　　　　09/26/13 – 04/30/18
NIH/NCATS
Harvard Clinical and Translational Science Center
Role: Co-Investigator

Departmental Grant (Unrestricted); Surgery　　　　　　　　Ashley, Stanley W. (PI)　　　　　　　　07/01/11 – 06/30/17
Brigham and Women's Hospital
Laboratory for Surgical and Metabolic Research
Role: Co-Investigator

1R01DK084064　　　　　　　　Tavakkoli, Ali (PI)　　　　　　　　09/30/11 – 08/31/16
NIH/NIDDK
Surgical Modulation of Intestinal Nutrient Transport
Role: Co-Investigator

Innovation Fellows Program Award　　　　　　　　Kakoza, Rose M. (PI)　　　　　　　　10/01/14 – 09/30/15
Harvard Medical School
A Pilot Complex Care Management Team for Highly Complex and Chronically Comorbid Diabetic Patients (Restructuring and Ambulatory ICU in a Large Academic Medical Center)
Role: Co-Investigator

William G. Lennox Scholars in Medicine Award　　　　　　　　Parviz, Mahsa (PI)　　　　　　　　07/01/14 – 05/31/15
Harvard Medical School
Advancing mutational identification and analyzing disorders of GABA metabolism: SSADH and GABA-transaminase deficiencies
Role: PI

Young Clinician Award　　　　　　　　Sheu, Eric G. (PI)　　　　　　　　04/01/14 – 04/01/15
CIMIT/Boston Biomedical Innovation Center (NCAI/NHLBI)
Development of a Minimally Invasive Endoluminal Therapy for the Metabolic Complications of Obesity
Role: Co-Investigator

Innovation Fellows Program Award　　　　　　　　Cheng, Jennifer K. (PI)　　　　　　　　10/01/13 – 09/30/14
Harvard Medical School
Students as Health Coaches in a Team-Based, Patient-Centered Obesity Care Model
Role: Co-Investigator